# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SHANNON BATTEAST,

        Plaintiff,

        v.                                              Case No. 18-CV-347

NANCY A. BERRYHILL,

        Defendant.

## DECISION AND ORDER

### PROCEDURAL HISTORY

Plaintiff Shannon Batteast alleges that she has been disabled since September 19, 2013, due to depression, bipolar disorder, post-traumatic stress disorder, hallucination, anxiety, amnestic episodes, attention-deficit/hyperactivity disorder, insomnia, and chronic back pains. (Tr. 72, 83.) In September 2013 she applied for disability insurance benefits and supplemental security income. (Tr. 193-98, 202-08.) After her applications were denied initially (Tr. 72-93) and upon reconsideration (Tr. 96-131), a hearing was held before an administrative law judge (ALJ) on January 12, 2017 (Tr. 36-69). On February 17, 2017, the ALJ issued a written decision concluding that Batteast was not disabled. (Tr. 16-30.) The Appeals Council denied Batteast's request for review on January 26, 2018. (Tr. 1-

3.) This action followed. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 7) and the matter is now ready for resolution.

**ALJ'S DECISION**

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Batteast "has not engaged in substantial gainful activity since September 19, 2013, the alleged disability onset date." (Tr. 18.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 118, 1121 (7th Cir. 2014). The ALJ concluded that Batteast has the following severe impairments: "depression, a mood disorder, an anxiety disorder, posttraumatic stress disorder (PTSD), a personality disorder, attention deficit hyperactivity disorder (ADHD), dissociative disorder, and thoracic spine disc protrusions." (Tr. 18.)

At step three, the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1526, 416.920(d) and 416.926) (called, "The Listings"). If the impairment or

2

impairments meets or medically equals the criteria of a listing and also meets the twelve-month duration requirement, 20 C.F.R. § 416.909, the claimant is disabled. If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Batteast "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 19.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the claimant's ability to perform both physical and mental work-related activities on a regular and continuing basis despite her impairments. *Moore*, 743 F.3d at 1121. In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529; 416.929; SSR 96-4p. In other words, the RFC determination is a "function by function" assessment of the claimant's maximum work capability. *Elder v. Asture*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Batteast has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can only perform unskilled work; she is limited to jobs having only occasional decision making and occasional changes in work setting; she can occasionally interact with coworkers and supervisors; and she cannot have interaction with the public.

(Tr. 21.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work.

20 C.F.R. §§ 404.1526, 416.965. Batteast's past relevant work was as an administrative office clerk and office helper. (Tr. 28.) The ALJ concluded that she is unable to perform any past relevant work. (*Id.*)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. At this step the ALJ concluded that, considering Batteast's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Batteast can perform. (Tr. 29.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of the claimant's age, education, work experience, and RFC could perform the requirements of a food preparation worker, cleaner, and packager. (*Id.*) After finding that Batteast could perform work in the national economy, the ALJ concluded that she is not disabled. (Tr. 29-30.)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing

conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the Court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with his obligation to build an "accurate and logical bridge" between the evidence and his conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ committed a material error of law the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## ANALYSIS

Batteast argues that (1) the ALJ erred in finding that her subjective symptoms were not entirely consistent with other evidence in the record, (2) the ALJ improperly rejected the opinions of her treating medical providers, and (3) the ALJ's RFC assessment is not supported by substantial evidence. (ECF No. 13.)

I. **Symptom Evaluation**

In making his RFC determination the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an

underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2, *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities …." SSR 16-3p, at *2. The ALJ's evaluation is entitled to "special deference" and will not be overturned unless it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)).

The ALJ found that Batteast's medically determinable mental impairments could reasonably be expected to affect her ability to remember, complete tasks, concentrate, understand, follow instructions, get along with others, leave the house, and produce feelings of people looking at her and judging her, helplessness, crying spells, flashbacks, visual hallucinations of shadows, nausea, and episodes when she stayed up for days and then slept for days. (Tr. 22.) However, the ALJ concluded that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 22-23.) In reaching that conclusion, the ALJ explained that, despite Batteast's alleged symptoms, the treatment records established that she usually exhibited good mental function during

6

the period at issue, responded well to medication, and had relatively short hospital stays. (Tr. 23-24.)

Batteast argues that "[t]he fact that [she] decompensates under stress is well supported by the Record and should have factored into the ALJ's conclusion when assessing the weight to be accorded to [her] subjective statements[.]" (ECF No. 13 at 19.) She relies on multiple records that pre-date her September 2013 alleged onset date, as well as time-relevant records, including, most notably, her spring and summer 2015 inpatient hospitalizations. (*Id.* at 19-21.)

However, contrary to Batteast's contention, the ALJ considered that she had previously decompensated under stress. (*See* Tr. 23-24.) The ALJ explained that the medical evidence from Batteast's hospitalizations in the spring and early summer of 2015 suggested that she was suffering from "significant life stressors," including domestic abuse issues, losing her home, and moving. (Tr. 22-23.) He also explained that, "[e]ven though she was hospitalized, the inpatient care was fairly short in duration and she still exhibited some good mental function." (Tr. 23.)

Batteast was hospitalized for two days in February 2015 after her daughter reported to law enforcement that "she had observed [Batteast] with a handful of pills making the statement that she wanted to die." (Tr. 592.) However, Batteast "denied to law enforcement making any threats to harm herself," and reported that "her daughter got mad at her and told police who were already in the building that she was threatening

suicide." (Tr. 592-93.) During the hospitalization and upon discharge, her treating psychiatrist, John W. Carpenter, M.D., observed that Batteast was normally groomed, appropriately dressed, and fully oriented with an appropriate attitude, normal speech, a euthymic mood, a full range of affect, a logical thought process, normal thought content without hallucinations, normal perception, intact memory, normal attention and concentration, and no suicidal ideation. (Tr. 595, 597-98.)

She was also hospitalized for five days in March 2015 after she was found in a Walgreens pharmacy talking to a vacuum as if it was her son. (Tr. 599-620.) She appeared acutely psychotic and disoriented (Tr. 602), and she reported that she was not taking her depression medication (Tr. 599). Batteast was placed on antipsychotic medication and her confusion resolved. (Tr. 618.) "She remembered being very stressed at having to stay at a motel and then running out of money. She then started experiencing hallucinations and disordered thoughts." (*Id.*) Upon discharge, Dr. Carpenter observed that Batteast was fully oriented with an appropriate attitude, normal speech, a euthymic mood, a full range of affect, a logical thought process, normal thought content without delusions, hallucinations, or perceptual disturbances, normal perception, intact memory, normal attention and concentration, and no suicidal ideation. (Tr. 618-19.)

Batteast was again hospitalized for a couple of days in May 2015 due to reports of "visual, auditory hallucination, erratic mood and nonspecific physical complaints." (Tr. 743-66.) Her mood appeared anxious, but her speech, behavior, judgment, thought

8

content, cognition, and memory were normal. (Tr. 750.) Subsequent treatment records indicate that she was feeling overwhelmed after moving to Milwaukee from Sheboygan (Tr. 688) and was involved in an abusive relationship with a man who she described as very controlling (Tr. 635).

She was hospitalized once more in June 2015 due to reports of feeling depressed and having thoughts of self-harm. (Tr. 621-59.) She felt overwhelmed after leaving the abusive relationship "with the man she was living with in Milwaukee." (Tr. 647.) She was treated for "increased depression from situational stress." (Tr. 647.) At the time of discharge, Dr. Carpenter observed that she was fully oriented with an appropriate attitude, normal speech, a euthymic mood, a full range of affect, a logical thought process, normal thought content without hallucinations, normal perception, intact memory, normal attention and concentration, and no suicidal ideation. (Tr. 641.)

The day following her discharge Batteast returned to the emergency room because she became "very depressed" due to her inability to find a place to stay. (Tr. 647.) Her medication was altered and, after six nights in the hospital, she "reported gradual improvement of her anxiety, mood with resolution of her suicidal ideation." (Tr. 657.) She felt stable and requested discharge after "the father of her 2 oldest children was being supportive and offered for her to stay with him post discharge[.]" (*Id.*) Upon discharge, Dr. Carpenter observed that she was fully oriented with an appropriate attitude, normal speech, a euthymic mood, a full range of affect, a logical thought process, normal thought

9

content without hallucinations, normal perception, intact memory, normal attention and concentration, and no suicidal ideation. (Tr. 657-58.)

In sum, substantial evidence supports the ALJ's conclusion that Batteast's hospitalizations were fairly short in duration and due to "significant life stressors" (Tr. 23), and that Batteast exhibited good mental function at the time of each discharge. As such, Batteast has not shown that the ALJ's evaluation of her symptoms was "patently wrong." *See Horr v. Berryhill*, 743 Fed. Appx. 16, 20 (7th Cir. 2018).

## II. Medical Opinion Evidence

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 Fed. Appx. 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "An ALJ must offer goods reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted).

**A. Dr. Carpenter**

Batteast argues that the ALJ erred in giving only partial weight to the opinion of Dr. Carpenter. (ECF No. 18 at 9-13.) In September 2015 Dr. Carpenter completed a mental functioning questionnaire in which he opined that Batteast would have the following non-exertional limitations: (1) severe fatigue due to depressed mood, anxiety, and reduced stress tolerance, which would cause her to need to lie down for two hours during an eight-hour workday; (2) difficulty interacting with or working in proximity to others in a workplace setting due to anxiety, attention deficit problems, and reduced stress tolerance; (3) excessive impairment-related absenteeism (more than four days per month); (4) unscheduled work breaks two to three times per day due to panic/anxiety and fatigue; and (5) marked difficulties with regard to pace, persistence, or concentration due to attention deficit problems and anxiety, which would cause her to be "off task" thirty percent of the work day, work at less than fifty percent the pace of an average worker, and need an unusual level of supervision three or more times a day. (Tr. 532-34.)

The ALJ found Dr. Carpenter's opinion to be inconsistent with his own treatment notes. (Tr. 26-27.) Dr. Carpenter's notes indicate that Batteast repeatedly exhibited good mental function upon examination, including an intact memory, normal attention span, intact insight and judgment, an animated effect, no loose associations or delusions, and no suicidal ideation. (*See, e.g.,* Tr. 397, 460, 470, 478, 481, 595, 618-19, 641, 657-58, 671-72.) They also indicate that Batteast's depression and ADHD improved with medication. (*See,*

11

*e.g.,* Tr. 470 ("Notes no problems with depression. …. The Adderall was very helpful for her concentration."), 478 ("She notes that she continues to concentrate better with Adderall."), 592-93 ("She stopped taking the nortriptyline sometime ago as being away from her husband seem [sic] to solve her problems with depression. Notes she has not felt depressed recently."), 671 ("She notes that she sleeps well with Ambien and her [sic] the Adderall helps concentration. She reports no depression or posttraumatic stress symptoms."), 672 ("She notes she concentrates well with Adderall."); *see also* Tr. 478 (noting that major depression recurrent has improved), 481 (noting that major depression recurrent is stable), 595 (noting that major depression recurrent in partial remission), 671 (same), 672 (same).)

Batteast contends that "[t]he ALJ's reliance on limited, one-time mental status examinations during time periods in which [she] is unemployed and so not exposed to the stressors of full time work is misplaced" given that Dr. Carpenter's opinions in the questionnaire were with regard to "limitations he thinks [she] would have <u>if exposed to</u> the stressors of full time work." (ECF No. 13 at 10.) (Emphasis in original.) "This error is significant, given [her] decompensation (i.e. need for inpatient hospitalization) in response to stressors (which the ALJ acknowledges [she] has)." (ECF No. 22 at 2.)

However, as explained above, Batteast's hospitalizations were precipitated by "significant life stressors" (e.g., domestic abuse issues, losing her home, moving). (*See* Tr.

22.) Dr. Carpenter's treatment notes do not indicate that Batteast has an inability to cope with ordinary, everyday stress. (*See generally* Tr. 393, 397, 460, 469-70, 477-78, 481, 670-72.)

The ALJ also found Dr. Carpenter's opinion "not entirely consistent with [Batteast's] testimony indicating that she was able to manage her household and care for small children despite her mental health problems." (Tr. 27.) Batteast contends that "an ability to perform limited [activities of daily living] and take care of one's children does not evince an ability to engage in [significant gainful activity] such that Dr. Carpenter's opinions to the contrary should be rejected." (ECF No. 13 at 12.) In response, the Commissioner argues that "the ALJ did not inappropriately conclude that [Batteast's] activities of daily living] equated to the ability to sustain full-time work activity. Instead, the ALJ reasonably concluded that [Batteast's] activities indicated she could do more than [Dr. Carpenter] opined." (ECF No. 21 at 10.)

The court agrees with the Commissioner. Dr. Carpenter opined that Batteast would be off-task thirty percent of a typical workday, be less than half as efficient as an average worker, need extra supervision three times a day, and have trouble traveling independently more than four days per month. However, Batteast reported that she was able to take care of her children by herself (Tr. 54-55), bring her children to school (Tr. 54, 232), travel independently to her medical appointments (Tr. 263-64), shop for groceries (Tr. 234, 263), handle money (*id.*), make simple meals (Tr. 233, 262), and do light cleaning (Tr. 54, 233, 262). *See* SSR 96-2p, 1996 WL 374188 at *4 ("[A] treating source's medical

13

opinion on what an individual can still do despite [her] impairment(s) will not be entitled to controlling weight if substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion.").

Given all of the above, the court finds that substantial evidence in the record supports the ALJ's reasons for giving only partial weight to Dr. Carpenter's opinion.

### B. Dr. Jackson

Batteast also argues that the ALJ erred in giving little weight to the opinion of psychiatrist Basil Jackson, M.D. (ECF No. 13 at 13-14.) In February 2016, Dr. Jackson completed a mental functioning questionnaire in which he opined that Batteast would have the following non-exertional limitations: (1) severe fatigue due to depressed mood, disturbed sleep, and pregnancy, which would cause her to need to lie down for three or more hours during an eight-hour workday (Tr. 690); (2) difficulty interacting with or working in proximity to others in a workplace setting due to high irritability (Tr. 690-91); (3) excessive impairment-related absenteeism (more than four days per month) (Tr. 691); (4) unscheduled work breaks six or more times per day due to crying, intrusive thoughts, panic/anxiety, paranoia, fatigue, and a need to isolate (*id.*); and (5) marked difficulties with regard to pace, persistence, or concentration, which would cause her to be "off task" more than twenty percent of the work day, work at less than fifty percent the pace of an average worker, and need an unusual level of supervision three or more times a day (Tr. 692-93).

The ALJ gave little weight to Dr. Jackson's opinion:

> [I]t is inconsistent with the observations by Dr. Carpenter within the treatment notes, which showed that [Batteast] exhibited some good mental function throughout the period at issue. It is also notable that Dr. Carpenter had the opportunity to observe [Batteast's] mental condition on more occasions than Dr. Jackson. It appears Dr. Jackson was associated with Renew Counseling Services, a facility where the claimant attended individual counseling sessions with Mike Sealey, MSW. However, the treatment records from Renew Counseling Services did not establish that Dr. Jackson saw [Batteast] on a regular basis throughout the period at issue. Moreover, Dr. Jackson's assessment that [Batteast] had marked limitation in the area of concentration, persistence or pace is inconsistent with the evidence showing that [Batteast] repeatedly exhibited a normal attention span, she was able to take care of her young children, and medication improved her symptoms of ADHD.

(Tr. 27.) (Internal citations omitted.)

Batteast contends that the ALJ's consideration of Dr. Jackson's limited treatment relationship is flawed because, although Dr. Jackson signed the February 2016 questionnaire, it was actually prepared by Mike Seeley, her treating psychotherapist. (ECF No. 13 at 14.) "[U]pon review of the actual assessment, the handwriting on it is identical to the handwriting of Mike Seeley … [and] [t]he assessment was … addressed to Mike Seeley." (*Id.*) "Thus, even though the assessment was signed by Dr. Jackson as a physician at Renew Counseling, it seems clear from the Record that the opinions contained in it were opined-to by Mike Seeley, based on his treatment history with Batteast at Renew Counseling." (*Id.*)

While the handwriting is similar, there is no other evidence that Seeley prepared the mental impairment questionnaire. (Tr. 690-93.) Even if the questionnaire was

15

prepared by Seeley, the opinion would not be entitled to controlling weight under the regulations as Seeley is not an "acceptable medical source" (*see* 20 C.F.R. § 404.1513(d)(1)), and the ALJ gave other valid reasons for discrediting the opinion contained in the questionnaire. As such, the ALJ did not err in giving little weight to the opinion of Dr. Jackson.

### III. RFC Assessment

An RFC is the assessment of the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect her ability to work. SSR 96-8p, 1996 WL 374184, at *2. An ALJ's RFC assessment must incorporate *all* of the claimant's limitations supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). It "represents the maximum a person can do—despite [her] limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96-8p).

The ALJ concluded that Batteast had the RFC to perform light work, "except she can only perform unskilled work; she is limited to jobs having only occasional decision making and occasional changes in work setting; she can occasionally interact with coworkers and supervisors; and she cannot have interaction with the public." (Tr. 21.) Batteast argues that the ALJ's limitation to unskilled work fails to account for her deficits in maintaining concentration, persistence, or pace, including memory loss resulting from

16

her dissociative disorder. (ECF No. 13 at 15-18; *see* ECF No. 22 at 4 ("There is no limitation related to the memory/processing deficits related to Batteast's dissociative disorder[.]").)

The ALJ concluded at step three of the sequential evaluation process that Batteast had moderate limitations "[w]ith regard to concentrating, persisting, or maintaining pace" (Tr. 20), and gave great weight to the opinions of state agency psychological consultants Edmund Musholt, Ph.D., and Jack Spear, Ph.D., both of whom opined that Batteast had moderate limitations in maintaining concentration, persistence, or pace (Tr. 79-81, 90-92, 109-11, 127-29).

However, the ALJ did not account for Batteast's deficits in maintaining concentration, persistence, or pace in his RFC determination. Unskilled work is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). "A limitation to unskilled work is generally insufficient to account for moderate limitations in concentration, persistence, or pace because '[t]he ability to stick with a task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.'" *Janowski v. Berryhill*, 17-CV-363, 2019 WL 337118, at *2 (N.D. Ind. Jan. 25, 2019) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)); *see Radosevich v. Berryhill*, __ Fed. App'x. __, 2019 WL 286172, at * 2 (7th Cir. Jan. 22, 2019) ("[A]lthough [claimant] may have the mental capacity to complete a single, simple task, the hypothetical did not capture the limitation in her ability to execute that simple task over

an extended time."); *O'Connor-Spinner*, 627 F.3d at 620 (rejecting argument that "an ALJ may account generally for moderate limitations on concentration, persistence or pace by restricting the hypothetical to unskilled work").

The Commissioner argues that

> the ALJ did not merely assume that a limitation for unskilled work would account for [Batteast's] concentration deficits. Instead, he relied on the expert opinions of Drs. Musholt and Spear that [Batteast] was capable of performing such work. The Seventh Circuit has held that an administrative law judge is entitled to rely on a medical expert "who effectively translate[s] an opinion regarding the claimant's mental limitations into an RFC assessment." *Milliken v. Astrue*, 397 F. App'x 218, 221 (7th Cir. 2010)[.]

(ECF No. 21 at 7.) However, the Commissioner misconstrues the opinions of Drs. Musholt and Spear. Drs. Musholt and Spear opined in their mental RFC assessments that Batteast "may have difficulty at times remembering more than simple 2-3 step instructions" (Tr. 79, 90, 109, 127); "may have difficulty focusing for extended periods of time and carrying out more than simple instructions" (Tr. 80, 91, 110, 128); "may not always interact appropriately with others in the workplace due to a tendency to be socially withdrawn and not preferring the company of others" (*id.*); "may have difficulty adjusting to anything more than very routine changes in the workplace" (Tr. 80, 92, 110, 128); and "is unable to sustain semi-skilled or skilled work, but remains capable of performing the mental demands of unskilled work" (Tr. 81, 92, 111, 129). The ALJ's RFC assessment does not accommodate the limitations in Dr. Musholt's and Spear's mental RFC assessments in the areas of concentration, persistence, and pace.

18

Given that the ALJ's RFC determination failed to accommodate Batteast's deficits in maintaining concentration, persistence, or pace, remand is necessary.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and this matter is **remanded** pursuant to 42 U.S.C. 405(g), sentence four, for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 22nd day of February, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge